Carr, J.
It was admitted by the counsel who argued this cause for Stone (as well as it could be argued), that by the 6th section of the original act of 1794, alien for quotas attached to the property insured, in the hands of the insurer. But, though it was admitted as a point too plain to be argued, that this lien bound the property in the hands of the first owner, it was strongly denied, that such lien existed when the land had passed into other hands, and the broad position seemed to be taken, that the legislature could not raise a lien which should thus follow the subject into all hands. That the act meant to create such a lien, is clear from the use of the word assigns, which could have been introduced for no other purpose; nor can I doubt the power of the legislature to do this, since the law violated no right, but merely settled the terms of the contract, between the society and the insured, and left every one at liberty to become a member or not. Every man has a right to bind his property by a lien, a mortgage, for instance, which when perfected according to law, follows it into all hands. This was nothing more. The party insuring, for himself, his heirs and assigns, engaged his property as a security for all moneys due or to become due on it.
But it was insisted, that the 8th section of the same act made the insured property liable in the hands of vendees, only where they received a notice of the insurance from the vendor. . That section enacts, that to the end, that purchasers, and mortgagees of property insured by virtue of this act, may not become losers thereby, the subscribers selling, mortgaging or otherwise transferring such property, shall at the time apprise the purchaser or mortgagee of such assurance, and indorse to him the policy thereof; and in *229 every case of such change, the purchaser or mortgagee shall he considered as a subscriber in place of the original he. It was contended, that such change meant a sale or mortgage accompanied by notice and assignment of the policy. I cannot think, that the language used renders this construetion necessary; and it is most clear to me, that, so far from being the intention of the law, it would mar and prostrate the whole scheme on which the institution was founded. The law was speaking of changes of property by sale, mortgage or other transfer; and the following phrase “ in every case of such change,” means of a change by sale, mortgage or other transfer. If the act, meant to hold the property hound, only where the sale was attended by notice, why did it say, that notice should be given to save purchasers or mortgagees from loss ? They could incur no loss, where there was no notice, if the sale to them without notice discharged the lien. There are many other considerations, which I need not state, that convince me, that such a construction would go far to destroy, at a blow, the whole institution.
But it was insisted, that the act of 1805 was a new constitution, abolishing all pre-existing laws, liens he. I think clearly not. It was an amendment, and only abolished former laws, rules and regulations, so far as they were repugnant to that act. Such are its words. The former act creating a lien on the property insured, was so far from being repugnant, that it was the very foundation on which this amendment rested. This is apparent; for take away that act, and there is no lien on the property insured, even in the hands of the original subscribers. It was also insisted, that the company has been guilty of laches. I do not think that doctrine attaches, farther than it would to a mortgagee. The lien of the society is by an instrument under seal, which the law says binds the property, as a security for all charges growing due under the laws, rules &c. of the society; and this is the exact definition of a mortgage. *230 There has been no such laches here as would affect the claim of a mortgagee.
There were several other objections made, but none of any weight. I think the decree should be reversed.
Cabell, J. concurred.
Tucker, P.
The merits of this controversy mainly depend, upon the true construction of the laws, constitution, rules and regulations of The Mutual Assurance Society.
The scheme of this society, however simple in its principles, has, unfortunately, not been carried into effect, with an ability proportioned to the benevolence of the design. We have the authority of the act of 1794 for saying, that the plan, upon which the simple idea of an association of individuals for their mutual insurance against fire, was to be carried into effect, was formed, suggested and published, by Mr. Ast; and though he may have had the aid of some professional gentleman to throw it into the form of a law, its clumsy and inartificial execution can leave little doubt of its real parentage. Drawn without system, and expressed, in many instances, in terms wholly inappropriate, it is not wonderful, that it has been a fruitful source of litigation; and so deeply imbued was the first act with these defects, that all the subsequent legislation seems to have been marked by the original vice of its constitution. Such an instrument therefore requires to be construed with a liberality which will attain the real objects of the contracting parties, instead of a critical rigour which would defeat their most obvious intentions; and this, indeed, is the more proper, as the parties stand in the double relation of insurers and insured, and their contract cannot properly be interpreted, more strongly against them in one character than in the other.
Awkward as is the draft of the original constitution, it is not difficult to penetrate its real design. Contemplating an association, which might embrace every owner of a building in the commonwealth, and which should engage to insure *231 all its members against losses from fire, it was intended, that ^ each member of the association should contribute, to the common fund cut of which losses were to be repaired, a certain per centage, called a premium, upon the value of the property he should himself seek to have insured. And as the original sum thus subscribed or contributed, would in the ordinary course of things be exhausted, unless provision was made for replenishing the fund, it was provided, in substance, that whenever the reduced state of the funds should require a further contribution, there should be a call upon the members for such contribution, and each should be bound to pay an equal per centage upon his original premium. These subsequent contributions were called quotas; and thus, if the wants of the society required that it should call •for a sum equal to half the original capital, each member was called upon to pay a sum equal to one half his original premium, which was called a half quota; et sic de similibus. Having ascertained the sums to be paid by each, as contributors to the common stock in which they were interested as insurers, or (which is the same thing) the sum to be paid by each as insured, it next became necessary to provide for the enforcing of these contributions from the refractory or the backward. To effect this object, the projet (whether wise or unwise) was to render the property, thus insured from destruction, and supported and upheld by the society, responsible for the payment; doubtless, upon the idea of some supposed relation between the advantage it derived, and the duty to be imposed. So it is, it was declared in the original act of 1794, that the subscribers mutually for themselves, their heirs and assigns, engaged the property-insured (but none other) as security, and subjected the same, if necessary, to be sold for the payment of such quotas; that is to say, for such future contributions as might be necessary from time to time to maintain the integrity of the fund.
A question has been much discussed heretofore, whether the property insured was or was not bound for the original *232 premium, if the subscriber failed to pay it j and, in Greenhow v. Barton, judges Fleming and Roane, though differing in the judgement they gave, seem to have agreed in the opinion, that until the payment of the premium the insurance was incomplete, and the property was not bound in the hands of the purchaser. It seems, however, to be a question of no importance in relation to the original insurance in this case, as the original premium was paid, and the assurance was of course complete; but we shall have occasion to examine it, as it respects the new declaration. Nor can it admit of doubt, that Vaughan himself was personally responsible for quotas anteriour to the act of 1805, and that the property was in like manner responsible while it continued in his hands.
By that act, considerable changes were effected in the constitution of the society: some of them so vital, as to have been arraigned as unconstitutional and void. The separation of the town from the country insurance, in other words, the absolving a large portion of the society from the burdens of the contract, and thus depriving the rest of that aid in sustaining them, for which they had in effect contracted, was deemed by many, high-handed, unjust and unconstitutional. The small towns, particularly, complained of being left to encounter the hazard of the sweeping losses of the cities, without the aid of the country contributions. But this question was put at rest by this court, in Currie’s adm’r v. The Mut. Ass. Society. One very salutary and acceptable provision, however, was introduced j I mean the clause which permitted any dissatisfied party to dissolve the contract as to himself, by withdrawing from the society. After the enactment of this provision, no party who did not avail himself of it, could fairly be understood to wish to give up its benefits, or get rid of the burdens it imposed.
This act has been called a new constitution, out and out; but I think it must be regarded rather as an innovation in-grafted on the original stock. It did not repeal the old constitution and laws in toto, hut only in such matters as *233 were repugnant to the act itself. What was its effect upon some of the most material provisions of the first act will be presently examined. At the time it passed, Vaughan was living, and still owner of the property, and the act having authorized, and indeed required, a revaluation, he acquiesced in the measure. A revaluation was made, and he signed a new declaration, binding himself to abide by the constitution &c. of the society. A further premium was however required of him, as the revaluation proved the property to be worth more than before, which premium, it seems, never was paid by him, and constitutes in fact a part of the society’s demand. It was the opinion of the chancellor, that no pledge of the property was at any time to be made to secure the payment of the original premiums, or of the additional premiums ; and it appearing ihoi part of the demand was for additional premiums, the bill was yet dismissed in omnibus. This would seem to have been an error, even if the premises were true ; for, though the property was not bound, it does not follow, that Vaughan’s estate, if there was any (which ought to have been ascertained), was not responsible for the additional premium which accrued in his time. For judge Roane and judge Fleming concurred in the case of Greenhow v. Barton, in thinking the subscriber personally bound for the unpaid premium, though the former thought the property was not so liable in the hands of a purchaser, and the latter supposed it not so liable even in the hands of the insurer. Moreover, unless the failure to pay the additional premium, not only left the new contract incomplete, but also abrogated the old one, which cannot be pretended, it is not easy to conceive why the bill should have been dismissed as to the whole demand, merely because a part of the demand could not be sustained.
Let us, however, pursue this subject of the non-payment of the premiums somewhat farther. The personal liability of the declarant, for the premium, has been already shewn to have been established by the concurrent opinions of judges Roane and Fleming, which opinion is sustained by the *234 10th section of the act of 1794. The'liability of the jpro- • !Periy °f the declarant, for the premium^ seems equally to be provided for by the same section; which declares, that, in default of payment of the premiums, the subscribers may be to pay them, and their property shall be liable to be sold for the payment of the same. The meaning of this section, is further explained by the act of December 1795, which may be considered, indeed, as part of the res gesta. From this act also it is clear, that the property was to be held liable for the original premiums, as a general principle; but, it was declared to apply only to subsequent insurances, obviously with a view to favor those who had contributed to carry the scheme into execution by becoming subscribers, but who seem, from the preamble of the act, to have been inclined to withdraw before they were irrevocably bound, unless such a provision was enacted-. With these views, I intirely concur with judge Roane, that the property was bound for the premiums, while it remained in the hands of the declarant; nor can I perceive how judge Fleming, who expresses a different opinion, could avoid the force of the enactment in the 10th section. The fact, that by the law the society was not bound, while the premiwth was unpaid, cannot sustain this opinion; for it was not bound while a quota was unpaid, and yet it is agreed on all hands, that the property was subject to quotas. The truth is, the legislature obviously discarded (in relation to this institution) the ordinary principle of contracts, that both parties shall be bound, or neither; for it expressly provided, that the responsibility of the society for losses, should be suspended the instant a quota was in arrear, and yet left the insurer liable to the recovery of the quota with interest thereupon.
Having thus shewn, that the contract of insurance, however incomplete as to the responsibility of the society, was nevertheless complete as to the liability of the declarant, and of the property insured, while it continued his, it may next be asked, how the property can be considered as absolved in the hands of an assignee, who purchases with no *235 tice. If the property be bound m the declarant’s hands, .... , ,. , ... , re , ' can he by Ins act remove that liability r It the contract was complete before the sale of the premises, so far as to render both person and property liable, is it rendered incompíete by the sale? I cannot think so; and cannot concur in the opinion expressed by judge Roane that “ the 8th section of the act of 1794, relating to the liability of purchasers and mortgagees, is confined to cases of property, the insurance of which has been perfected by the payment of the premiums.” For, according to this opinion, if one declares for insurance, and then sells to another before he pays the premium, though the vendee have full notice of the assurance, the property, which in the hands of the vendor was bound, is in the vendee’s hands absolved, because, as it is said, the insurance was not perfected, when the assignment was made. This does not seem reasonable; and I am, therefore, clearly of opinion, that the property continues bound, for payment of premiums, as well as quotas, in the hands of an assignee with notice.
How is it as to an assignee without notice ? This question becomes important to be decided in the present case, because the defendant has not only pleaded, but has shewn, I think, that he is a purchaser without notice. As this matter was much discussed at the bar, it is my duty to shew the reasons of this opinion. The rule is unquestionable, that he who would protect himself as a purchaser without notice, must shew himself to be a complete purchaser. If, therefore, either his purchase money remains unpaid, or he has not completed his title by obtaining a conveyance before he receives notice, the notice will affect him; for, if he receive that notice before both of those acts are perfected, he ought to stop until the equity is inquired into, or he will be bound by it. Sugd. Law Vend. 530. Thus, although he has paid every cent of his purchase money, and the hopeless insolvency of his vendor would prevent his ever recovering it back, yet if ho has not completed his title by having a conveyance prior to his notice of the prior equity, he must stop, *236 arid will not be permitted to go on to secure himself by obtaining the legal title, from the common vendor. And this is in strict consonance with justice, and in strict analogy with equitable principles. It rests upon the maxim which prevaj]s jn equity, as well as at law, Qui prior est in tempore, potior est in jure, where two equities are equal, the prior equity shall prevail. If then A. has made the first purchase of an estate, he has prior equity to B. who purchases afterwards; and, in a mere contest of equities, A. must prevail; for if the vendor refused to make title to either, and a suit were brought in equity for a title, the court would obviously decree a conveyance to A. Such then being the case, as soon as B. receives notice of the prior equity of A. he becomes at once apprised of the fact, that he has the best right to the land, and that a court would so decree. It is then, obviously, a fraud in B. to proceed to get a title to that property which he knows to belong to another, though the formality of a conveyance has not been complied with. But"if he has paid his money and obtained his conveyance before notice, his conduct has been fair, and having equal though posterior equity, he will be protected, because he has the legal title also, fairly acquired. He must, however, have obtained the legal title, or must shew, that, though posterior in time, he has the lest right to call for the legal title. In this case, Stone most certainly has not the legal title : that legal title is in the trustee Wallace: the releases of the cestuis que trust never can pass it. But, though he has not the legal title, he has the lest right to call for it. He stands, in relation to the purchase, in the shoes of the creditors whom he has paid. He bought from Vaughan with the knowledge of the creditors’ claims, and upon engagement to pay them; and his case comes clearly, I think, within the principle of Williamson v. Gordon’s ex’or; and he has proved, very clearly, that he had paid the purchase money.
I recur then to the question, whether an assignee without notice, will be protected in equity against the claim of this *237 assurance society? On this subject, we have the express decision of the supreme court of the U. States in The Mut. Ass. Society v. Watts’s ex’or, and also the opinion of judge Fleming in Greenhow v. Barton, that the clause of the act, which requires the seller to give notice to the purchaser, a matter merely between themselves, with which the society has no concern, and that the property is bound in the assignee’s hands without notice. Let us examine this matter for ourselves.
The contract of assurance is a covenant real, entered into by the insured with the insurer. It is a covenant entered into by the fee simple holder, whose jus disponendi is absolute. His charges upon the property by way of covenant, cannot be gainsaid by a subsequent purchaser. That purchaser, in making his purchase, takes the property cum onere, and he can only look to his vendor’s covenants to protect him against the incumbrance. Like the grant of a right of way, or of a right to divert a water course, this covenant is binding upon a subsequent purchaser, who has notice of its existence, and even if he has no notice, provided the rights arising under the covenant are legal and not merely equitable. For the covenant is one of those which runs with the land. It is indissolubly connected with a covenant on the part of the society to insure against fire; a covenant which goes to sustain, support and uphold, the property which is charged. It is emphatically, then, one of those contracts, which being for the benefit of the estate, and annexed to it, passes with the title to all who purchase with a knowledge of its existence. And having taken with such knowledge, they are personally bound in respect of the estate which they hold, so long as the property continues theirs. A fortiori, the lien upon the property remains; and neither can be removed but by notice of withdrawal, as provided by law. But, not only is the assignee with notice bound both in person, and as to the property purchased; but the property is bound even without notice, whether he is bound personally or not; a question, which I do not mean to touch. *238 For, the liability of the property is not only imposed by the party himself, in adopting and consenting to abide by the constitution, laws &c. of the society; but the act of the legislature itself declares, that the subscribers, as soon as tjiey gjiap jnsur6j sc ¿0 mutually for themselves, their heirs, executors, administrators and assigns, engage their property insured, as security, and subject the same to be sold, if necessary, for the payment of quotas.” This charge declared and imposed by the law itself, cannot be regarded as a mere equitable claim. The jurisdiction exerted by a court of equity for carrying it into effect, does not change its nature from a legal lien into a mere equity. Like other cases, in which parties are before a court of equity, where the claim of one is superiour to the other in the estimation of the law, equity will respect the legal preference. Thus, if various creditors are before the court, seeking the distribution of legal assets, the legal superiority of a claimant is duly respected. If various creditors have judgement liens, which are obstructed by a fraudulent conveyance; upon setting aside that conveyance, the eldest judgement creditor will have his priority of right duly preserved. So in this case; though equity lends its aid to the enforcement of this lien, yet is it emphatically a legal and not an equitable lien. It is declared by the law itself, as strongly as the lien on the debtor’s land created by judgement in behalf of private individuals, or the lien on the lands of public defaulters in behalf of the commonwealth. It must, therefore, be treated as a legal lien, and as such it cannot be successfully repelled by the plea of purchaser without notice; a plea which can avail only against a merely equitable title.
In the argument of this case, it has been contended, that whatever may be the effect of the act of 1794, the act of 1805 contains no provision giving to the society a lien on the insured premises, for the additional premium, and the annual instalments required by that act, or for those which have been subsequently authorized by the act of 1809. It is true, there is. no such express provision in either of those *239 acts, bnt the first of them repeals only such parts of antecedent laws as are repugnant to itself. It left untouched the sections of the act of 1794, which declare the liability of the property insured, for the payment of the quotas. But it was said there are no longer any quotas, but instead of them, an annual contribution, first by the act of 1809 for ten years, and now continued by that of 1819, at the discretion of the society. These are, however, the same thing in effect. For, as I have already said, the quota was itself but such contribution as might be necessary from time to time, to maintain the integrity of the fund. And what else are the annual assessments made, first under the act of 1809, and afterwards under that of 1819? The terms, indeed, are changed, but the substance is the same; and so, for more than twenty years, the law has been universally understood.
With respect to some other topics, I must content myself with very succinct remarks. No fault is attributable to the society, for not giving notice to the purchaser, for it is not presumable the agent in this city is conusant of the sales made in remote parts of the state. Nor am I aware, that the legal rights of the society can be affected by their omission to demand payment at an earlier day; by which failure, as it is said, the defendant Stone will be a sufferer. Whether it would have forfeited its lien by failure to give notice of it, if a notice of Stone’s purchase and of Vaughan’s situation could have been brought home to it, is a question which the facts in the case do not require me to examine; but without any evidence of fraudulent concealment on the part of the society or its agents, or of knowledge of the interest of Stone in the transaction, it is impossible, I think, that it can justly be deprived of its lien. I cannot but observe, that common prudence would naturally dictate an inquiry on the part of a purchaser, whether his vendor is or is not an insurer; an inquiry so easily satisfied, by an application to the public office established by the society according to law. Yet, on the other hand, I will remark, that it *240 is singular the society have not made an effort to prevent, as far as possible, disputes as to notice, by affixing, as is usual with insurance companies, some emblem of the insuranee on some conspicuous part of the tenement insured. por) though I am of opinion, that, notice or no notice, the lien is preserved, yet this opinion, it is well known, has not always nor universally prevailed.
The decree entered by this court, declared, that the appellants were entitled to have a sale of the premises for the amount of their demand, unless the appellees or one of them should pay and satisfy the same within a reasonable time to be fixed by the court of chancery: therefore, the chancellor’s decree was reversed with costs, and the cause remanded, to be proceeded in, according to the principles here declared.